## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

CHRISTY A. BUTIGAN,
    c/o Wilmer Cutler Pickering Hale & Dorr LLP
    1875 Pennsylvania Avenue NW
    Washington, DC 20006

                    Plaintiff,

    vs.

SALAH MOHAMMED K. A. AL-MALKI,
SALWA AWAD M. SAEED,

                    Defendants.

Civil Action No. 1:13cv514

GBL/TCB

JURY TRIAL DEMANDED

FILED

2013 APR 26  P 1:27
CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

## COMPLAINT

Christy A. Butigan, by and through her undersigned counsel, files this Complaint against Salah Mohammed K. A. Al-Malki and Salwa Awad M. Saeed and in support thereof alleges the following:

### INTRODUCTION

1.    This Complaint is brought by Christy Butigan, a 31-year-old Filipino woman trafficked through Qatar into the United States and forced to work excessive hours for meager pay in the home of a Qatari official and his wife, Defendant Salah Mohammed K. A. Al-Malki ("Defendant Al-Malki") and Salwa Awad M. Saeed ("Defendant Saeed"), respectively.

2.    Before traveling to Qatar, Ms. Butigan lived with her husband, two young children, mother-in-law, and ailing mother, all of whom resided in her home in the Philippines. Her husband worked full-time as a security guard, and Ms. Butigan sought additional income to supplement his wages. Ms. Butigan made the difficult decision to leave her family to work abroad and earn money to send back home.

3.     Ms. Butigan entered into a two-year contract with 5 Star Agency, an employment agency located in the Philippines, to work as a domestic servant in Qatar for Defendants Al-Malki and Saeed.  The contract specified that Ms. Butigan would earn $400 per month, working eight hours a day, seven days a week.  From August 9, 2010, until September 9, 2010, Ms. Butigan left her children and family to attend training at a 5 Star Agency facility in Manila.

4.     On or about September 10, 2010, Ms. Butigan boarded a plane for the ten-hour flight to Qatar, leaving her native Philippines for the first time.  Upon arrival, an unnamed local employment agency ("Qatar Agency") met Ms. Butigan at the Doha airport.  Qatar Agency immediately confiscated her passport, providing it to the Al-Malki family member who picked her up from the agency office.  Ms. Butigan never regained possession of her passport during her time with Defendants.

5.     For two months after her arrival, Defendants and their mothers confined Ms. Butigan in their homes, berated her, paid her only half of what was promised in her contract, and forced her to work nineteen hours a day with no time off.  Ms. Butigan tried to end her employment with the Defendants – who in any event were not adhering to the contract – and return home to the Philippines.  Defendants refused to release her unless she paid them a substantial amount of money, which they well knew she could not pay.

6.     When Ms. Butigan first arrived in Qatar, Defendant Al-Malki – the patriarch of the family – worked as the Medical Attaché for the Qatari Embassy in Washington, D.C.  In October of that year, Mr. Al-Malki returned to Qatar and announced that he was relocating his family to the United States.  Defendant Al-Malki told Ms. Butigan she would be coming to the United States with the family.  He selected her because she was the youngest of the domestic servants.

Ms. Butigan, having no contacts in Qatar, speaking none of the language, and having very little money, had no choice but to go to the United States.

7.      After only two months in Qatar, Defendants Al-Malki and Saeed trafficked Ms. Butigan to the United States under a fraudulently obtained visa, which Defendants acquired by presenting a false contract to the U.S. Embassy in Qatar. The new contract promised $1,500 per month for working six-hour days, six days a week, with overtime and holiday pay. Ms. Butigan would never receive anything close to those terms.

8.      Upon arriving in the United States, Defendant Al-Malki again confiscated Ms. Butigan's passport and visa. He had returned these documents to her briefly in the United States – just long enough for her to get through immigration control without incident – and then seized them again. Defendants Al-Malki and Saeed then confined Ms. Butigan to their house in Tyson's Corner, Virginia, and forced her to work three times as many hours as provided in the contract. Ms. Butigan worked as much as seventeen hours per day, seven days a week, and was paid roughly $0.75 per hour.

9.      Defendants ensured Ms. Butigan's confinement by holding her travel and identification documents, prohibiting her from leaving the house or speaking to others in public, and subjecting her to frequent verbal abuse. Defendants' actions kept Ms. Butigan in constant fear and isolation such that she had no alternative than to continue working for the family.

10.     Defendants neglectful treatment of Ms. Butigan also caused her to have dental procedures that may have otherwise been lessened or avoided. While Ms. Butigan was still confined in Defendants' home she often had pain in her teeth. After Ms. Butigan left Defendants she sought treatment for the pain. She had to have hundreds of dollars of surgical treatment to

fix the problem, which included painful abscesses, and Ms. Butigan's dentist concluded that the condition was caused by neglect.

11.     Defendant Saeed also had an explosive temper. She frequently yelled at Ms. Butigan while she worked, berated her for being "dirty" because she was Christian, and blamed her when the family became ill. Defendant Saeed often humiliated Ms. Butigan in the presence of other people and, on one occasion, Defendant Saeed even raised her hand and threatened to strike Ms. Butigan. Defendant Saeed was prevented from doing so only when Defendant Al-Malki restrained her, insinuating that U.S. law mandated better treatment of Ms. Butigan than Qatari law. Immediately after this incident Ms. Butigan overheard the Defendants discussing their return to Qatar and their desire to take Ms. Butigan back with them.

12.     Fearing that Defendant Al-Malki would take her back to Qatar, where she would be unable to escape and where the law would not protect her from physical abuse, Ms. Butigan fled Defendants' home on or about April 27, 2011. In her desperation, Ms. Butigan left without her passport and travel documents, which were kept in a locked room in the house. She left with a few possessions and the very little money she had saved from her meager wages that she had not yet sent home to her family.

13.     After her escape, Defendants then attempted to track down Ms. Butigan. They contacted her family in the Philippines and somehow identified and contacted the people who had provided Ms. Butigan with shelter.

14.     For seven months Defendants Al-Malki and Saeed confined Ms. Butigan and forced her to work in the their homes for wages less than a dollar an hour. Defendants violated both federal and state law, pursuant to which they are liable to her for damages. Ms. Butigan seeks to

hold Defendants civilly liable under the Trafficking Victims Protection Act, the Fair Labor

Standards Act, and Virginia state law for their wrongful acts, as detailed below.

## BACKGROUND

15.    Ms. Butigan is a survivor of forced labor, involuntary servitude, and human

trafficking, as defined by the Victims of Trafficking and Violence Protection Act of 2000

("TVPA"), Pub. L. No. 106-386, 114 Stat. 1464.  Traffickers coerce their victims into

performing labor through a variety of means, including through psychological abuse, threats,

isolation, and confinement.

16.    According to the State Department's 2012 Trafficking in Persons Report, available at

http://www.state.gov/j/tip/rls/tiprpt/2012/, Qatar is often a destination country for trafficking

victims subjected to forced labor:

> Men and women from Nepal, India, Pakistan, Bangladesh, the Philippines,
> Indonesia, Vietnam, Sri Lanka, Ethiopia, Sudan, Thailand, Egypt, Syria, Jordan,
> and China voluntarily migrate to Qatar as low-skilled laborers and domestic
> servants, but some subsequently face conditions of involuntary servitude. These
> conditions include threats of serious physical or financial harm; withholding of
> pay; charging workers for benefits for which the employer is responsible;
> restrictions on freedom of movement, including the confiscation of passports,
> travel documents, and the withholding of exit permits; arbitrary detention; threats
> of legal action and deportation; threats of filing false charges against the worker;
> and physical, mental, and sexual abuse.

17.    The 2011 State Department's Country Report on Human Rights Practices reiterates

the problem of trafficking in persons in Qatar, as well as institutional discrimination against

women, noncitizens, and foreign workers. *See*

http://www.state.gov/documents/organization/186656.pdf.  Human Rights Watch has also

documented extensive violations of migrant workers' rights in Qatar. *See*

http://www.hrw.org/news/2013/02/07/qatar-promises-little-action-migrant-workers-rights.

Likewise, the 2011 State Department 's Trafficking in Persons Report notes that a "significant

number of Filipino men and women who migrate abroad for work are subjected to conditions of involuntary service worldwide" and are "subjected to conditions of forced labor . . . as domestic workers in Asia and increasingly throughout the Middle East." *See* http://www.state.gov/documents/organization/164457. "Fraudulent recruitment practices and the institutionalized practice of paying recruitment fees often left workers vulnerable to forced labor [and] debt bondage." *Id.*

18.   The State Department has also issued Circular Diplomatic Notes specifically condemning the conduct of foreign diplomats related to domestic workers. A May 20, 1996 Note describes the State Department's concern about continuing problems in the working relationships between the diplomatic and consular community and their domestic employees, including "where wages have been withheld from personal domestics for undue periods, where the wages actually paid are substantially less than those stipulated at the time of employment, where passports have been withheld from the employee, where the actual number of working hours weekly is substantially more than those originally contemplated and with no additional pay, and where the employee has been forbidden from leaving the employer's premises even though off duty." A June 19, 2000 Note further communicated to foreign missions, including Qatar, the State Department's requirement that diplomatic employers execute and include an employment contract in full compliance with United States law in all A-3 visa applications.

19.   As recently as April 2013, the *New York Times* has reported on the problem of indentured servitude, particularly in Qatar. The article opens with a story mimicking Ms. Butigan's circumstances: a Filipino woman was paid far less than originally promised, worked seven days a week, was forced to clean several of the family's households, was fed only one meal a day, and was told that she could not quit. The article further notes that workers are often

-6-

recruited through personnel agencies that charge high fees that are difficult to pay back,

especially given that the listed salary on their work contract is often "a sham" intended to meet

the sending government's requirements (*i.e.,* $340 a month for the Philippines).  Richard Morin,

*Indentured Servitude in the Persian Gulf,* N.Y. Times, April 13, 2013,

http://www.nytimes.com/2013/04/14/sunday-review/indentured-servitude-in-the-persian-

gulf.html?pagewanted=all&_r=0.

## JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331

because the action arises under U.S. law.  The Court has supplemental subject matter jurisdiction

over the asserted state law claims pursuant to 28 U.S.C. § 1367.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial

part of the events or omissions giving rise the claims occurred in the Eastern District of Virginia.

Venue is also proper in this District for Defendants Al-Malki and Saeed pursuant to 28 U.S.C. §

1391(c)(3) because Defendants do not reside in the United States.

## THE PARTIES

22.     Christy A. Butigan is a citizen of the Republic of the Philippines.  At the time of the

events that gave rise to this Complaint, Defendants Al-Malki and Saeed forced Ms. Butigan to

work in Qatar from approximately September 10, 2010 until December 9, 2010, and in Vienna,

Virginia, from approximately December 10, 2010 until her escape on or about April 27, 2011.

23.     Upon information and belief, Defendant Al-Malki is a citizen of Qatar currently

residing in Qatar.  At the time of the events that gave rise to this Complaint, Defendant Al-Malki

was the Medical Attaché for the Embassy of Qatar in Washington, D.C.  During this time,

Defendant Al-Malki resided – along with his wife, Defendant Saeed, their two children, and Ms. Butigan – at 7979 Vigne Court, Vienna, Virginia.

24.     Upon information and belief, Defendant Saeed is a citizen of Qatar also currently residing in Qatar. At the time of the events that gave rise to this Complaint, Defendant Saeed resided – along with her husband, Defendant Al-Malki, their two children, and Ms. Butigan – at 7979 Vigne Court, Vienna, Virginia.

## ALLEGATIONS OF FACT

**A.     Defendants Traffic Ms. Butigan to the United States through Qatar.**

25.     Christy Butigan was born in the Philippines and, prior to traveling to Qatar to work for Defendants Al-Malki and Saeed, resided there with her husband and two young children. Ms. Butigan's mother, who suffers from cardiac health issues, and her mother-in-law also live with the family.

26.     Ms. Butigan's husband works full-time as a security guard and Ms. Butigan sought additional means to sustain her family. Ms. Butigan is a high school graduate and speaks Tagalog and some English; during her time in Qatar she learned to understand basic words and commands in Arabic, but does not speak the language.

27.     In late 2009 or early 2010, Ms. Butigan heard a radio advertisement by 5 Star Recruitment & Manpower Corporation ("5 Star Agency"), an employment agency based in the Philippines, that specializes in placing workers in Dubai, Qatar, and Kuwait. Ms. Butigan applied for a domestic worker position at the 5 Star Agency office located in Cotabato City and was selected for a position in Qatar.

28.     On August 9, 2010, Ms. Butigan traveled to the 5 Star Agency Manila office in Cubao, where she stayed for one month to receive training, a health assessment, and other

necessary documentation to work abroad.  During this time, 5 Star Agency controlled Ms.

Butigan's movements and took her passport and identification documents, allowing her

possession of the documents only during appointments to obtain the necessary work permits,

visa, medical certificate, and other related materials, after which, 5 Star Agency immediately

took control of the documents.  Ms. Butigan slept on the cement floor of an apartment owned by

the Agency with several other domestic workers and was given a curfew.  If Ms. Butigan had

wanted to return home at this time, she would have had to pay the Agency the entirety of her

travel and training expenses, which the Agency very well knew she could not afford.

29.     While in Manila, Ms. Butigan signed a contract with 5 Star Agency to work for two

years as a domestic servant for a family in Qatar.  Under the contract, she would earn $400 per

month for working eight hours a day, seven days a week, with provisions for sick days.  5 Star

Agency never gave her a copy of this contract.  On information and belief, 5 Star Agency also

paid for Ms. Butigan's visa and airfare to Qatar and told Ms. Butigan  these costs would be

deducted from her first month's salary as reimbursement.  5 Star Agency also told Ms. Butigan

that she would owe them a lot of money if she ever left her position to reimburse the Agency for

the expenses incurred in Manila and for travel to Qatar.  Even if Ms. Butigan had been paid

according to the contract, it would have taken her a long time to have enough money to pay back

this amount.  As it was, Ms. Butigan was paid only $200 per month, which she sent back to her

family.

30.     On or about September 10, 2010, Ms. Butigan traveled to Qatar with several other

domestic workers trained by 5 Star Agency.  Upon arrival in Qatar, the group was picked up by a

representative of Qatar Agency, an unidentified local employment agency, who accompanied

Ms. Butigan and the others through immigration.  The Qatar Agency representative took

possession of Ms. Butigan's passport directly from the  passport control officer.  The Qatar Agency representative then transported the group to their office nearby, where Ms. Butigan waited to be picked up by her new employers.

31.     Around 1 a.m., Defendant Al-Malki's cousin arrived at the Qatar Agency office to take Ms. Butigan to Defendants' residence.  The Qatar Agency gave Ms. Butigan's passport directly to the cousin.  The cousin drove Ms. Butigan to his house, where she was forced to share a bed with another domestic worker from the Philippines for the rest of the night.

32.     On or about September 11, 2010, the cousin took Ms. Butigan to Defendant Al-Malki and Saeed's home, where she met Defendant Saeed, a Qatari housewife with four-month-old twins.  At the time, Defendant Al-Malki was stationed in the United States as a Medical Attaché at the Qatari Embassy in Washington, D.C.  Ms. Butigan, therefore, did not meet him immediately, but spoke with him by telephone.  Other household staff warned Ms. Butigan that Defendant Saeed had an explosive personality like a "bomb" and could become very angry and that she had hit a previous domestic worker.  The other domestic workers also told Ms. Butigan that she would likely be going to the United States with the family, which was the first Ms. Butigan had heard of this plan.

33.     Shortly after her arrival, Defendant Saeed – who already possessed Ms. Butigan's passport – seized her remaining identification documents, including her school records, OWWA (domestic worker certificate issued by the Philippines), POAA (identity document issued by the Philippines), NBI certificate, and medical certificate, as well as her personal photographs of her family and children.  Ms. Butigan never possessed her passport again and never saw the remaining documents or the pictures of her family and children again.

34.     In Qatar, Defendant Saeed, Saeed's mother, and Al-Malki's mother forced Ms. Butigan to work around the clock cleaning each of their residences, cooking for the families, and caring for the four-month-old twins. Ms. Butigan worked from 5:00 a.m. until midnight, seven days a week, without any time off. She was often woken up in the middle of the night to prepare meals for the family. In return, Defendants paid Ms. Butigan only meager wages – far less than promised under her contract.

35.     In Qatar, Defendants subjected Ms. Butigan to constant verbal abuse. Ms. Butigan was shouted at, told she could not leave the house, and called offensive names. Defendants made Ms. Butigan wear a uniform that covered her entire body and hair at all times. To sleep, Defendants forced Ms. Butigan either to share a bed with another domestic worker employed by Defendant Saeed's mother or to sleep on a piece of plywood in a room the size of a large closet, with only a small electric fan in the a climate that could exceed 100 degrees. Ms. Butigan was permitted to eat only once a day and was chastised if she ate anything other than rice. The grueling schedule, lack of sleep, and inadequate nutrition kept Ms. Butigan in a constant state of exhaustion.

36.     Despite working nearly around-the-clock, Defendant Saeed told Ms. Butigan that they would pay her only $200 per month, half of the $400 her contract promised. When Ms. Butigan protested that she was owed $400, Defendant Saeed told her that the contract had only included the $400 wage to meet the legal requirements for a visa to be granted in the Philippines. Now that Ms. Butigan was in Qatar, Defendants would pay her only $200. Ms. Butigan was also not paid for her first month in Qatar because Defendants told her that these wages were paid directly to the Qatar Agency for her travel expenses to Qatar. For her three months, or ninety-one days,

in Qatar, working nineteen hours per day, seven days a week, with no days off, Defendants paid Ms. Butigan only $400 – roughly $0.23 per hour.

37.     Because of the harsh working conditions and because Defendants were not paying her according to the contract, Ms. Butigan told Defendant Saeed several times that she wanted to leave their employment and return to the Philippines. Defendant Saeed refused to allow Ms. Butigan to leave unless she paid Defendants all of her travel and training expenses. Ms. Butigan could not afford to repay these costs on her meager wages, as Defendants knew, and in any event she regularly sent her wages as remittances to her family in the Philippines.

38.     While in Qatar, Ms. Butigan heard incidents of other house workers having their cellphone SIM cards destroyed, having hot water or acid thrown on them, and being killed by an employer. Ms. Butigan thought of escape, but had little money, nowhere to go, spoke no Arabic, and was a woman in a male-dominated society. She feared for her safety if she left Defendants' home in Qatar.

39.     In late October, Defendant Al-Malki left his diplomatic post in the United States to briefly visit his family in Qatar. He intended to bring his wife, Defendant Saeed, their twin boys, and a domestic worker back with him to the United States. In October 2010, Defendant Al-Malki chose Ms. Butigan, the youngest domestic worker in the household, to come to work in their home in the United States. Defendant Al-Malki told Ms. Butigan they would be going to the U.S. Embassy in Qatar to file the paperwork. Ms. Butigan, who had never been told by either of the agencies that she might be required to leave Qatar, was afraid to go to the United States. But Ms. Butigan also feared being left behind in a frightening environment in Qatar with no travel documents and no means to return to the Philippines.

40.     On the way to the U.S. Embassy in Qatar, Defendant Al-Malki provided Ms. Butigan with a new contract, written in English. The contract that Defendant Al-Malki presented to the U.S. Embassy and that Ms. Butigan signed stipulated that she would be paid $1,500 per month, included health benefits and a food allowance, and would work for six hours a day, six days a week, and receive an overtime rate of $10 per hour and double pay on holidays. Ms. Butigan, knowing that she did not have a choice in the matter, was nevertheless pleased by the new contract's terms, which would have allowed her to send more money home to her family.

41.     Defendant Al-Malki accompanied Ms. Butigan to the U.S. Embassy in Qatar, where a consular officer interviewed and fingerprinted Ms. Butigan. During the interview, a U.S. Embassy officer told Ms. Butigan that her employer must follow the provisions of the contract in the United States and provided her with a booklet that outlined U.S. labor laws. Immediately after leaving the Embassy, Defendant Al-Malki confiscated the contract and the booklet; Ms. Butigan has never seen either again.

42.     Upon information and belief, Defendant Al-Malki sought an A-3 visa for Ms. Butigan at the U.S. Embassy, which would allow him, as a foreign official, to bring a domestic employee into the United States. An A-3 visa requires an employer to pay domestic employees in accordance with U.S. law. The U.S. embassy reviews the employment contract to ensure it indeed complies with U.S. labor laws before issuing a visa. Defendants Al-Malki and Saeed never intended to and never followed the provisions of the contract. Defendant Al-Malki presented the contract merely as a means to obtain a fraudulent visa for Ms. Butigan to traffic her to the United States.

43.     On or about December 10, 2010, Defendants Al-Malki and Saeed trafficked Ms. Butigan from Qatar to the United States. Upon arrival in the United States, Defendants Al-Malki

-13-

and Saeed immediately seized Ms. Butigan's passport directly from the immigration officer at

Dulles International Airport. Defendants remained in possession of her passport and other

identification documents. Defendants then took Ms. Butigan to their residence in Tyson's

Corner, Virginia.

### B. Defendants Force Ms. Butigan to Work Slavish Hours, Subject Her to Verbal Abuse, and Pay Her Meager Wages in the United States.

44.     In the United States, Defendants Al-Malki and Saeed again forced Ms. Butigan to

work around the clock. Defendants subjected Ms. Butigan to verbal abuse while she cleaned the

four-story residence, cooked for the family, and cared for the Defendants' twin sons. Ms.

Butigan worked from 8 a.m. until very late, sometimes 1 a.m., seven days a week. She never

received a single day off. She was paid roughly $0.75 per hour, far less than the $1500 a month

plus overtime promised in the contract provided to the U.S. Embassy in Qatar.

45.     In the United States, Defendant Saeed frequently yelled at Ms. Butigan without any

justification or cause. Defendant Saeed regularly attacked Ms. Butigan for her personal hygiene,

telling her that she was dirty and that she did not wash herself. Defendant Saeed even blamed

Ms. Butigan for a bacterial infection that the twins contracted. Defendant Saeed's comments and

insults, sometimes in front of others, were intended to and did cause Ms. Butigan to feel

ashamed, embarrassed, and humiliated. As a result, Ms. Butigan actually began to feel unclean.

She started wearing gloves when she cleaned and showered twice a day to avoid further insults

from Defendant Saeed.

46.     Defendant Saeed insulted Ms. Butigan's religion and told her that she was dirty

because she was a Christian. The Defendants required Ms. Butigan to wear a uniform that

covered her arms and legs when she was in the house. During a visit to the Qatar Embassy in

Washington, D.C., Defendant Al-Malki also asked Ms. Butigan to convert to become a Muslim,

stating that if she did, he would forget her sins and give her a gift. Defendants' comments about Ms. Butigan's religion made her feel uncomfortable because she is devoted to her religion and did not want to convert to Islam.

47. For almost three months, the Defendants had different guests staying with them. During this time, Defendants forced Ms. Butigan to sleep on an office floor with only a comforter, requiring her to store her belongings and change her clothes in the closet that contained the air-conditioning unit.

48. Ms. Butigan ate only coffee and some bread for breakfast and rice later in the day because Ms. Saeed yelled at or questioned her if she ate anything else. Some days she only had the coffee and bread. As a result of the restricted diet, Ms. Butigan lost weight and her clothes became loose while working for Defendants.

49. While being confined by Defendants, Ms. Butigan also suffered pain in her teeth and sinus area, for which she was never taken for treatment. After Ms. Butigan escaped, she sought treatment that generated costs totaling $483 and included a surgical procedure to fix the problem. Her dentist told her the painful abscesses could have been avoided had she been permitted to seek treatment earlier.

50. Once in the United States, Defendants told Ms. Butigan that she would be paid only $500 per month, which was only one-third of the $1500 her contract promised. Defendant Saeed further deducted $40 per month on occasion when she decided that Ms. Butigan had allowed food in the refrigerator to spoil.

51. For her five months, or 138 days, in the United States, often working seventeen hours per day, seven days a week, with no days off, Defendants paid Ms. Butigan only $1700 total, less periodic subtractions of $40 for spoiled food. Ms. Butigan worked more than 100 hours per

week, far exceeding the 36 hours dictated by the contract. She earned roughly $0.75 per hour. When Ms. Butigan was paid only one-third of what her contract promised, she asked for a copy of the contract. Defendant Saeed became angry and refused to provide a copy. Ms. Butigan, fearful of angering Defendant Saeed further, did not ask about the contract again.

### C.    Defendants Isolate Ms. Butigan and Confine Her to their Virginia Home.

52.    At all times in the United States, Defendants Al-Malki and Saeed confined Ms. Butigan in their Virginia home by confiscating her travel and identification documents, prohibiting her from leaving, closely monitoring her when they left her alone, and threatening that she must pay them money before she could leave. Because of Defendants' conduct, Ms. Butigan was trapped as a virtual prisoner in Defendants' home.

53.    Defendants refused to allow Ms. Butigan to leave the house by herself for any reason. They did not provide her with house keys. Ms. Butigan was not allowed to go shopping, run errands, or even go for a walk. Her movements were dictated by Defendants' movements. Ms. Butigan left the house only when Defendant Al-Malki or Saeed needed her to accompany them or to care for the twins. On one occasion, Defendant Saeed refused to allow Ms. Butigan to leave the house to wire money to the Philippines to help her sick children. Defendant Saeed told Ms. Butigan she did not feel like leaving the house and reminded Ms. Butigan that she was prohibited from leaving the house alone. Not until fifteen days later did Defendants finally provide a driver from the Qatari Embassy to accompany her.

54.    When Ms. Butigan did leave Defendants' home, it was to accompany Defendant Saeed and care for the twins while Defendant Saeed shopped, ate at restaurants, stopped by the Qatari Embassy, or ran errands. During these outings, Defendant Saeed forbade Ms. Butigan to

speak with or have contact with anyone.  If Ms. Butigan spoke with anyone, Defendant Saeed became very angry with her.

55.     For the five months that Ms. Butigan was forced to work for Defendants in the United States, Defendants left her alone in the house on only two occasions: once when the family went to New York for a long weekend in April 2011, and again on the day Ms. Butigan escaped. While they were away, Defendants instructed Ms. Butigan not to leave the house and called the house every thirty minutes to check on her.  Defendants were also friends with the neighbors across the street, and Ms. Butigan feared that the neighbors watched her while Defendants were away.

56.     Ms. Butigan stayed because she had nowhere to go and because she was terrified to leave.  Defendants had seized her passport and identification documents and kept them in a locked room in the home.  Without her documents, Ms. Butigan was afraid that she could be arrested or deported at any time.  Ms. Butigan knew no one, spoke only some English, and had little money, and because of her confinement, Ms. Butigan was unfamiliar with the area surrounding the house.

57.     Because of the working conditions in the United States – and because Defendants were not adhering to the contract – Ms. Butigan wanted to leave the employment and return home to her family in the Philippines, but Defendant Saeed had previously told her that she could not leave unless she paid Defendants a lot of money, far more than she could afford on her meager wages.  Defendants well knew that Ms. Butigan could not afford to pay them any amount as they were aware that she was sending nearly all of her money home to her family.  They knew she would be left homeless and undocumented if she left the residence.  Ms. Butigan, confined and isolated in Defendants' home, stripped of her travel documents, fearing enormous debt if she

left, and with only minimal assets, felt that she had no alternative than to continue working for Defendants. Ms. Butigan became more fearful when she learned that Defendants intended to take her with them when they returned to Qatar in May.

**D.    Ms. Butigan Escapes Defendants' House.**

58.    In April 2011, Ms. Butigan asked Defendants if, prior to returning to Qatar, she could go back to the Philippines to visit her children. Defendant Saeed told Ms. Butigan that she could return to the Philippines, so long as she returned to Qatar after one month, and the meantime, left all of her money with Defendants. Defendant Saeed well knew that Ms. Butigan would be unable to afford a plane ticket if she was forced to leave all of her savings with Defendants.

59.    On or about April 27, 2011, after Defendants returned from the long weekend in New York, Ms. Butigan again told Defendant Saeed that she wished to return to the Philippines. Defendant Saeed reiterated the conditions to Ms. Butigan, that she would have to leave all of her money with Defendants. Ms. Butigan told Defendant Saeed she had changed her mind.

60.    At this time, Defendants discovered that while they were away, Ms. Butigan had made several calls home to the Philippines. This was the first time since Ms. Butigan left her family in September that she had made phone calls home to her husband and children. Defendant Saeed became angry. She began yelling at and interrogating Ms. Butigan. Ms. Butigan, crying and in fear of Defendant Saeed, apologized for the calls home and offered to pay for the costs. Defendant Saeed raised her hand and tried to hit Ms. Butigan, and was only prevented from doing so when Defendant Al-Malki told her to stop, telling her that they were not in Qatar and that she could not hit Ms. Butigan in the United States. Ms. Butigan fled the room. Listening from the next room, Ms. Butigan believed that Defendant Al-Malki told Defendant Saeed that tomorrow she would return to Qatar the next day.

61.     Ms. Butigan was terrified of returning to Qatar.  She did not speak the language, knew no one, and feared that she would be alone with Defendant Saeed, as Defendant Al-Malki would not be returning until May 10.  And based on Defendant Al-Malki's statement and the stories she had heard in Qatar, she believed she would not have any protections if Defendant Saeed wanted to hit her or do something worse.

62.     Shortly after the confrontation and out of frustration at the interaction, Defendants, for only the second time since Ms. Butigan arrived in the United States, left the house without Ms. Butigan.  Ms. Butigan, knowing that Defendants rarely left her alone in the house, and that they planned to take her back to Qatar the next day, believed this was her only chance to flee.

63.     Ms. Butigan tried to find her passport and other identification documents,  but was unable to do so.  Fearful of Defendants' imminent return, Ms. Butigan abandoned her search and immediately grabbed a few things, leaving most of her possessions.  She ran from Defendants' house into the street and into a rainstorm.

64.     Ms. Butigan had never been permitted to even walk around the neighborhood. Unsure of where to go, she headed down the street.  Eventually Ms. Butigan saw a woman in a garage and asked if she could take shelter until the storm passed.  Seeing that Ms. Butigan was crying and obviously upset, the woman asked her what was wrong.  Ms. Butigan told her about her imprisonment in the Defendants' home.

65.     With the help of this woman, Ms. Butigan was able to contact an individual she had met while waiting for Defendant Saeed during an errand.  The individual provided Ms. Butigan with a phone number in case Ms. Butigan ever had any trouble.  This individual provided Ms. Butigan with a place to stay and helped her contact the Philippine Embassy and other organizations providing social services and pro bono legal services.

### E.    Defendants Continue to Pursue Ms. Butigan.

66.    Since Ms. Butigan's escape from Defendants' house in April 2011, Defendants have attempted to track her down. Defendants have contacted her family and friends, asking for her whereabouts or contact information. Ms. Butigan fears that Defendants may find her and force her to work for them in the United States. She also fears that they will force her to pay them the money they demanded, or, worst of all, force her to return to Qatar.

67.    In June 2011, Ms. Butigan's family in the Philippines received two phone calls from Defendant Saeed, in which Defendant Saeed demanded to know where Ms. Butigan was and how to contact her. Because Ms. Butigan had been able to contact her family and recount her imprisonment and abuse in the United States, her family did not to provide any information to Defendant Saeed.

68.    In August 2011, Defendants Al-Malki or Saeed called the house where Ms. Butigan had taken shelter. Ms. Butigan recognized Defendants' number on the caller ID and was afraid to answer the phone call. This was the Defendants' last known attempt to contact Ms. Butigan.

69.    Ms. Butigan remains fearful today that Defendants may find her and force her to return to work in the United States or Qatar or to pay them money for leaving her position. She lives in fear that they will either force her to pay her "debt" to them for fleeing the position or force her to return to Qatar.

70.    At all times during Defendants' confinement of Ms. Butigan, Defendants subjected Ms. Butigan to continuous abuse and repetitious wrongs.

### CLAIMS FOR RELIEF

### COUNT I

**(Forced Labor in Violation of the Trafficking Victims Protection Act of 2000 ("TVPA"),
18 U.S.C. §§ 1589(a), 1595)**

**(Against All Defendants)**

71.     Ms. Butigan re-alleges and incorporates by reference the allegations in this Complaint as though fully set forth herein.

72.     Under 18 U.S.C. § 1589(a), it is unlawful to "knowingly provid[e] or obtain[] the labor or services of a person . . . (1) by means of force, threats of force, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

73.     As alleged herein, Defendants knowingly provided or obtained Ms. Butigan's labor and domestic worker services by threats of force, physical restraint, or threats of physical restraint to Ms. Butigan; serious harm or threats of serious harm, including financial harm; abuse or threatened abuse of law or legal process; and/or a scheme, plan, or pattern intended to cause Ms. Butigan to believe that if she did not perform the labor or services, she would suffer serious harm, including psychological, financial, or reputational harm, or physical restraint, in violation of the forced labor provision of the TVPA, 18 U.S.C. § 1589(a).

74.     Defendants knowingly provided or obtained Ms. Butigan's labor by means of physical restraint or threats of physical restraint by confiscating her travel documents, confining her to their residences, on one occasion raising a hand to strike her, and threatening to take her back to Qatar.  Such threats constitute physical restraint or threats of physical restraint under 18 U.S.C. § 1589(a)(1) and (2).

-21-

75.     Defendants made threats that if Ms. Butigan left their residence or the employment, she would owe them a lot of money.  Such threats constitute a scheme that caused Ms. Butigan to believe that she had no option but to continue working for defendants or serious harm under 18 U.S.C. § 1589(a)(1) and (2).

76.     Defendants executed a scheme, plan, or pattern intended to cause Ms. Butigan to believe that if she did not continue to work for Defendants, she would suffer serious harm by requiring her to pay a debt to leave the employment, by controlling her living conditions, and by controlling her travel documents.  Such a scheme is prohibited by 18 U.S.C. § 1589(a)(1) and (2).

77.     Under 18 U.S.C. § 1589(b), it is unlawful to "knowingly benefit[], financially or by receiving anything of value, from participating in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any such means."

78.     As alleged herein, Defendants knowingly benefited, financially or by receiving something of value, from participation in a venture that violated 18 U.S.C. § 1589(a), knowing or in reckless disregard of the fact that the venture was engaging in activity that violated § 1589(a).

79.     Defendants Al-Malki and Saeed knowingly benefited financially or by receiving something of value, namely Ms. Butigan's domestic worker services for minimal compensation, from participation in a venture that resulted in Ms. Butigan's forced labor and involuntary servitude, knowing or in reckless disregard of the fact that their activity violated 18 U.S.C. § 1589(a), as alleged above.

80.     Ms. Butigan brings this claim for relief pursuant to 18 U.S.C. § 1595.

81. As a direct and proximate result of Defendants' actions, Ms. Butigan has suffered damages in an amount to be established at trial.

82. Ms. Butigan is entitled to recover damages to account for the full value of her losses, including but not limited to emotional distress, lost wages, punitive damages, and other losses suffered by Ms. Butigan as a proximate result of Defendants' conduct, and reasonable attorneys' fees for Defendants' wrongful conduct

## COUNT II

### (Involuntary Servitude in Violation of the TVPA, 18 U.S.C. §§ 1584, 1595)

### (Against All Defendants)

83. Ms. Butigan re-alleges and incorporates by reference the allegations in this Complaint as though fully set forth herein.

84. Under 18 U.S.C. § 1584(a), it is unlawful to "knowingly and willfully hold[] to involuntary servitude or sell[] into any condition of involuntary servitude, any other person for any term, or bring[] within the United States any person so held."

85. "Involuntary servitude" includes "a condition of servitude induced by means of . . . any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or . . . the abuse or threatened abuse of the legal process." 22 U.S.C. § 7102(5).

86. As alleged herein, Defendants knowingly and willfully subjected Ms. Butigan to a condition of involuntary servitude for a period of two months in Qatar and five months in the United States in violation of 18 U.S.C. § 1584 that led her to believe she would suffer serious financial harm and potential physical abuse if she did not comply. Defendants also abused the

legal process to imprison Ms. Butigan, including by presenting fraudulently obtained documents to obtain her visa and leading her to believe that she was contractually bound to repay them for her flight costs if she left.

87.     Defendants' threats and coercion caused Ms. Butigan to reasonably believe that she had no alternative but to continue to work for Defendants.

88.     Ms. Butigan brings this claim for relief pursuant to 18 U.S.C. § 1595.

89.     As a direct and proximate result of Defendants' actions, Ms. Butigan has suffered damages in an amount to be established at trial, but in any event no less than.

90.     Ms. Butigan is entitled to recover damages to account for the full value of her losses, including but not limited to emotional distress, lost wages, punitive damages, and other losses suffered by Ms. Butigan as a proximate result of Defendants' conduct, and reasonable attorneys' fees for Defendants' wrongful conduct.

## COUNT III

**(Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of the TVPA, 18 U.S.C. §§ 1590, 1595)**

**(Against All Defendants)**

91.     Ms. Butigan re-alleges and incorporates by reference the allegations in this Complaint as though fully set forth herein.

92.     Under 18 U.S.C. § 1590(a), it is unlawful to "knowingly recruit[], harbor[], transport[], provide[], or obtain[] by any means, any person for [peonage, slavery, involuntary servitude, or forced labor]."

93.     As alleged herein, Defendants knowingly recruited, harbored, transported, provided and/or obtained Ms. Butigan, bringing her first to Qatar then to the United States on fraudulent

visas, for the purpose of involuntary servitude and forced labor in violation of the trafficking provision of the TVPA, 18 U.S.C. § 1590(a).

94.     As alleged herein, Defendants attempted to and did violate the prohibitions against involuntary servitude and forced labor set forth in 18 U.S.C. §§ 1584(a) and 1589(a) and(b).

95.     Ms. Butigan brings this claim for relief pursuant to 18 U.S.C. § 1595.

96.     As a direct and proximate result of Defendants' actions, Ms. Butigan has suffered damages in an amount to be established at trial.

97.     Ms. Butigan is entitled to recover damages to account for the full value of her losses, including but not limited to emotional distress, lost wages, punitive damages, and other losses suffered by Ms. Butigan as a proximate result of Defendants' conduct, and reasonable attorneys' fees for Defendants' wrongful conduct.

## COUNT IV

### (Unlawful Conduct with Respect to Documents in Furtherance of Trafficking, Peonage, Slavery, Involuntary Servitude or Forced Labor in Violation of the TVPA, 18 U.S.C. §§ 1592, 1595)

### (Against All Defendants)

98.     Ms. Butigan re-alleges and incorporates by reference the allegations in this Complaint as though fully set forth herein.

99.     Under 18 U.S.C. § 1592(a), it is unlawful to "knowingly destroy[], conceal[], remove[], confiscate[], or possess[] any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person . . . in the course of a violation of . . . [or] with intent to violate [the provisions under the TVPA prohibiting trafficking, peonage, slavery, involuntary servitude, or forced labor]; or . . . to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's

liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons."

100.    Under 22 U.S.C. § 7102(8)(B), "severe forms of trafficking in persons" includes "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."

101.    As alleged herein, Defendants knowingly concealed, removed, confiscated, or possessed Ms. Butigan's actual passport, immigration documents, and other government identification documents, including her school records, OWWA (domestic worker certificate issued by the Philippines), POAA (identity document issued by the Philippines), NBI certificate, and medical certificate, in the course of violating and with intent to violate 18 U.S.C. §§ 1584 and 1589, prohibiting involuntary servitude and forced labor.

102.    As alleged herein, Defendants attempted to and did violate the prohibitions against involuntary servitude and forced labor set forth in 18 U.S.C. §§ 1584 and 1589.

103.    As alleged herein, Defendants knowingly confiscated and possessed Ms. Butigan's documents with the intention to prevent or restrict, or to attempt to prevent or restrict, Ms. Butigan's ability to leave Defendants' residence in order to continue receiving her labor or services.

104.    As alleged herein, Ms. Butigan, who was recruited, harbored, transported, provided, and obtained for labor or services through the use of threats of force, fraud or coercion, has been a victim of severe forms of trafficking as defined by 22 U.S.C. § 7102(8).

105.    Ms. Butigan brings this claim for relief pursuant to 18 U.S.C. § 1595.

106.    As a direct and proximate result of Defendants' actions, Ms. Butigan has suffered damages in an amount to be established at trial.

107.    Ms. Butigan is entitled to recover damages to account for the full value of her losses, including but not limited to emotional distress, lost wages, punitive damages, and other losses suffered by Ms. Butigan as a proximate result of Defendants' conduct, and reasonable attorneys' fees for Defendants' wrongful conduct.

## COUNT V

**(Benefitting Financially from Trafficking in Persons
in Violation of TVPA, 18 U.SC. § 1593A, 1595)**

**(Against All Defendants)**

108.    Ms. Butigan re-alleges and incorporates by reference the allegations in this Complaint as though fully set forth herein.

109.    18 U.S.C. § 1593A makes it unlawful to "knowingly benefit[], financially or by receiving anything of value, from participation in a venture which has engaged in any activity in violation of section …1592 or 1595(a), knowing or in reckless disregard of the fact that the venture has engaged in such violation" to the same extent "as a completed violation of such section."

110.    As alleged herein, Defendants knowingly benefited, financially or by receiving something of value, from participation in a venture that violated 18 U.S.C. § 1589(a), knowing or in reckless disregard of the fact that the venture was engaging in activity that violated § 1589(a).

111.    Defendants knowingly benefited financially or by receiving something of value, namely Ms. Butigan's domestic worker services, from participation in a venture that engaged in activities in violation of 18 U.S.C. §§ 1592 or 1595(a) and either knew or was  in reckless disregard of the fact that the violated such provisions.

112.    As alleged herein, Defendants attempted to and did violate the prohibitions against document servitude, forced labor, and involuntary servitude enforceable under 18 U.S.C. §§ 1592 and 1595(a).

113.    Ms. Butigan brings this claim for relief pursuant to 18 U.S.C. § 1595.

114.    As a direct and proximate result of Defendants' actions, Ms. Butigan has suffered damages in an amount to be established at trial.

115.    Ms. Butigan is entitled to recover damages to account for the full value of her losses, including but not limited to emotional distress, lost wages, punitive damages, and other losses suffered by Ms. Butigan as a proximate result of Defendants' conduct, and reasonable attorneys' fees for Defendants' wrongful conduct.

## COUNT VI

### (Conspiracy to Violate TVPA, 18 U.S.C. §§ 1589, 1590, 1592, 1594, 1595)

### (Against all Defendants)

116.    Ms. Butigan re-alleges and incorporates by reference the allegations in this Complaint as though fully set forth herein.

117.    18 U.S.C. § 1594(b) makes it unlawful to "conspire[] with another to violate section … 1589, 1590, or 1592."

118.    As alleged herein, all Defendants conspired to violate 18 U.S.C. § 1589, 1590, and 1592 by agreeing to obtain or provide Ms. Butigan's services in violation of 18 U.S.C. § 1589, trafficking Ms. Butigan in violation of 18 U.S.C. § 1590, and withholding documents from Ms. Butigan in violation of 18 U.S.C. § 1592.  Defendants came to an understanding to commit these violation through the course of their dealings.

119.    Ms. Butigan brings this claim for relief pursuant to 18 U.S.C. § 1895.

120.     As a direct and proximate result of Defendants' actions, Ms. Butigan has suffered damages in an amount to be established at trial.

121.     Ms. Butigan is entitled to recover damages to account for the full value of her losses, including but not limited to emotional distress, lost wages, punitive damages, and other losses suffered by Ms. Butigan as a proximate result of Defendants' conduct, and reasonable attorneys' fees for Defendants' wrongful conduct.

## COUNT VII

**(Failure to Pay Federal Minimum Wage in Violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206, 216)**

**(Against All Defendants)**

122.     Ms. Butigan re-alleges and incorporates by reference the allegations in this Complaint as though fully set forth herein.

123.     29 U.S.C. § 206 establishes the right of all persons who are employed to be paid a minimum wage ($7.25 per hour) for all hours worked, including individuals employed as domestic servers in a household.

124.     At all relevant times, Defendants Al-Malki and Saeed jointly acted as Ms. Butigan's employer and Ms. Butigan was their employee, performing labor and services as a domestic service worker, within the meaning of 29 U.S.C. §§ 203(d) & (e) and 206(f).

125.     At all relevant times, Defendants failed and refused to pay Ms. Butigan minimum wage for all hours worked, in accordance with the FLSA.

126.     Defendants' failure to pay required compensation constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a). Defendants acted knowingly, willfully, or with reckless disregard that their conduct was prohibited, in failing to pay Ms. Butigan the required

wage, as further evidenced by Defendants submitting a fraudulent contract to obtain a visa for Ms. Butigan to enter the United States

127.    Ms. Butigan brings this claim for relief pursuant to 29 U.S.C. § 216(b).

128.    As a direct and proximate result of Defendants willful actions, Ms. Butigan has lost wages due to her, in an amount to be established at trial, but in any event no less than [$15,000 in unpaid wages and an equal amount in liquidated damages].

129.    As Ms. Butigan's employer, Defendants are liable for Ms. Butigan's unpaid minimum wages, plus an additional equal amount as liquidated damages, reasonable attorney's fees, and any other appropriate relief under the FLSA.

## COUNT VIII

### (False Imprisonment)

### (Against All Defendants)

130.    Ms. Butigan re-alleges and incorporates by reference the allegations in this Complaint as though fully set forth herein.

131.    Defendants Al-Malki and Saeed intentionally restricted Ms. Butigan's freedom, movement, or physical liberty, confining her to their home, without legal right, through the use of force, words, or acts, which Ms. Butigan was afraid to ignore or which she reasonably believed she must submit.

132.    Ms. Butigan was not free to leave Defendants' control.

133.    Specifically, Defendants Al-Malki and Saeed seized Ms. Butigan's passport and other identification documents, prohibited her from leaving the house without someone accompanying her, monitored her movements the one time they left her alone in the house, and threatened Ms. Butigan that she would owe Defendants a large amount of money if she left, all the while

knowing that Ms. Butigan spoke only some English, was not located near public transportation, was unfamiliar with the area, and had very little money.

134. Ms. Butigan was unlawfully confined in Defendants' Qatar home for nearly three months and their Virginia home for almost five months. During this time, Ms. Butigan never left Defendants' residences without someone accompanying her and was continuously monitored the one time Defendants left her alone in the house prior to her escape.

135. Because of Defendants' actions, Ms. Butigan was afraid to defy the Defendants and reasonably believed that she had to submit and remain in their home.

136. Defendants committed these acts maliciously, with the wrongful intention of causing harm to Ms. Butigan and in conscious disregard for her rights.

137. As a direct and proximate result of Defendants' conduct, Ms. Butigan suffered damages, including emotional and psychological distress, pain and humiliation, economic injury from being deprived of the ability to go about her personal affairs, and other injuries.

138. Ms. Butigan is entitled to recover damages in an amount to be determined at trial, including punitive damages, attorney's fees, and the cost of this action.

## COUNT IX

### (Breach of Contract)

### (Against All Defendants)

139. Ms. Butigan re-alleges and incorporates by reference the allegations in this Complaint as though fully set forth herein.

140. Defendants Al-Malki and Saeed created a legally enforceable obligation through the contract provided to Ms. Butigan at the U.S. Embassy in Qatar.

141.    Defendants violated or breached the contract by failing to honor the contract's terms, and the breach of the obligation caused injury or damage to Ms. Butigan.

142.    In order to obtain an A-3 visa for Ms. Butigan, Defendants Al-Malki and Saeed created and executed a new contract for Ms. Butigan's work in the United States. The contract provided for six-hour days, six days a week, for $1500 per month, in addition to $10 per hour for overtime, double-pay on public holidays, medical insurance, and other benefits.

143.    Ms. Butigan fully performed under her contract with Defendants by working as a domestic servant in Defendants' Virginia residence. Ms. Butigan actually performed beyond the contract terms, well exceeding the hours stated in the contract, with none of the benefits or time off promised by the document.

144.    Defendants also breached the contract signed for Ms. Butigan's work in Qatar. The contract provided for eight-hour days, seven days a week, for $400 per month.

145.    Ms. Butigan also performed under her contract with by working as a domestic servant in Defendants' Qatari residence. Ms. Butigan actually performed beyond the contract terms, well exceeding the hours stated in the contract, with none of the benefits or time off promised by the document.

146.    Defendants breached both of these contracts in several ways: by failing to pay Ms. Butigan the full amount due each month; by not compensating Ms. Butigan for hours worked beyond the contract terms; by not permitting Ms. Butigan to have a single day off; by not paying Ms. Butigan double pay on holidays; and by not providing any of the other health benefits or food allowance promised by the contracts.

147.    As a direct and proximate result of Defendants' actions, Ms. Butigan has suffered injury or damages.

148.   Ms. Butigan is entitled to recover damages in an amount to be determined at trial, including attorney's fees and the cost of this action.

## COUNT X

### (Fraudulent Misrepresentation)

### (Against All Defendants)

149.   Ms. Butigan re-alleges and incorporates by reference the allegations in this Complaint as though fully set forth herein.

150.   Defendants made false representations of material fact, intentionally and knowingly to mislead Ms. Butigan, who relied on the false representations, and consequently, suffered damages.

151.   Prior to coming to the United States and working in Defendants' Virginia home, Defendant Al-Malki, on behalf of Defendants, made false representations of material fact to Ms. Butigan, including, but not limited to, statements about working conditions in the United States and specified wages and hours.  With Ms. Butigan present, Defendants provided this information to the U.S. Embassy in Qatar.

152.   At the time Defendants made these statements, they knew them to be false. Defendants never had any intention of carrying out the representations.

153.   Defendants intentionally and knowingly made these statements with the purpose of misleading Ms. Butigan to believe that in the United States her working conditions would be better than in Qatar and to obtain an A-3 visa, so as to traffic her into the United States and force her to work in their Virginia home for meager wages.

154.    Ms. Butigan reasonably and justifiably relied on Defendants' representations, believing that she could earn more money to send home to her family by coming to the United States.

155.    As a result, Ms. Butigan suffered damages, as she was forced to work as a domestic servant for Defendants for illegally low pay and was denied her freedom and human rights.

156.    Defendants committed these acts maliciously and oppressively, with the wrongful intention of causing harm to Ms. Butigan and in conscious disregard for her well-being, Defendants obstructed Ms. Butigan from bringing a claim of fraud by direct and indirect means, including confiscating her passport and other identification documents and controlling her movements at all times.

157.    As a direct and proximate result of Defendants' misrepresentations, Ms. Butigan has suffered damages, including psychological abuse and economic, and emotional harm.

158.    Ms. Butigan is entitled to recover damages in an amount to be determined at trial, including punitive damages, attorney's fees, and the cost of this action.

## COUNT XI

### (Intentional Infliction of Emotional Distress)

### (Against All Defendants)

159.    Ms. Butigan re-alleges and incorporates by reference the allegations in this Complaint as though fully set forth herein.

160.    Defendants Al-Malki and Saeed acted intentionally or with reckless disregard for the high probability that emotional distress would occur, in an outrageous and intolerable manner that offends generally accepted standards of decency and morality, which caused Ms. Butigan's severe emotional distress.

161.    Defendants acted intentionally or with reckless disregard in an outrageous or intolerable manner by trafficking her from the Philippines to the United States through Qatar, confiscating her passport and identification documents, refusing to allow her to leave their homes, prohibiting her from speaking with anyone outside of the homes, regularly berating her, including when she ate anything other than rice, telling her she was dirty because she was Christian, accusing her of making Defendants' twin children sick, and refusing to pay her a decent wage in abhorrent working conditions.

162.    Defendants' conduct was extreme, outrageous, and intolerable in a way that would offend the generally accepted standards of decency and morality.

163.    Defendants' conduct caused Ms. Butigan severe emotional distress.  Defendants' conduct caused Ms. Butigan to be afraid of Defendants, to be embarrassed about her religion, to feel like she was dirty, and to feel humiliated.

164.    Defendants committed these acts maliciously and oppressively, with the wrongful intention of causing harm to Ms. Butigan, and in conscious disregard of Ms. Butigan's rights.

165.    As a direct and proximate result of Defendants' intentional actions, Ms. Butigan has suffered and continues to suffer severe mental distress, emotional injuries, humiliation, embarrassment, and economic loss.

166.    Ms. Butigan is entitled to recover damages in an amount to be determined at trial, including punitive damages, attorney's fees, and the costs of this action.

## COUNT XII

### (Assault)

### (Against Defendant Saeed)

167. Ms. Butigan re-alleges and incorporates by reference the allegations in this Complaint as though fully set forth herein.

168. Defendant Saeed intended to cause either harmful or offensive contact with Ms. Butigan that created in Ms. Butigan's mind a reasonable apprehension of an imminent harmful or offensive contact, when Defendant Saeed became angry at Ms. Butigan and raised her hand in an attempt to hit Ms. Butigan.

169. On or about April 27, 2011, Defendant Saeed, angry at Ms. Butigan for requesting to leave the employment and at the fact that Ms. Butigan had placed calls to the Philippines, intended to cause either harmful or offensive contact with Ms. Butigan when she raised her hand to hit Ms. Butigan.

170. Ms. Butigan reasonably believed and was fearful that Defendant Saeed would hit her when she raised her hand. Ms. Butigan reasonably believed that Defendant Saeed would have hit her, if Defendant Al-Malki had not stepped between his wife and Ms. Butigan.

171. Defendant Saeed acted willfully and wantonly when she raised her hand in an attempt to hit Ms. Butigan.

172. As a direct and proximate result of Defendants' intentional actions, Ms. Butigan has suffered damages.

173. Ms. Butigan is entitled to recover damages in an amount to be determined at trial, including damages for continuing pain and suffering, severe emotional distress, fright and humiliation, punitive damages, attorney's fees, and the cost of this action.

<u>COUNT XIV</u>

**(Punitive Damages/Special Damages)**

**(Against all Defendants)**

-36-

174.   Ms. Butigan re-alleges and incorporates by reference the allegations in this Complaint as though fully set forth herein.

175.   Defendants' tortious conduct as alleged herein was undertaken deliberately and with actual malice, that is, with a sense of consciousness and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud.

176.   Defendants' conduct involved reckless or callous indifference to the federal and state-protected rights of Ms. Butigan.  This conduct caused Ms. Butigan to suffer severe financial and emotional harm.

177.   Ms. Butigan is entitled to an award of punitive damages based upon Defendants' malicious conduct in an amount to be determined at trial.

## PRAYER FOR RELIEF

178.   WHEREFORE, Ms. Butigan demands judgment against all Defendants and respectfully requests that this Court grant the following relief, in amounts to be determined at trial, on each count detailed above:

a.   compensatory damages for each claim of relief;

b.   punitive damages;

c.   attorney's fees and costs;

d.   such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

179.   Ms. Butigan hereby demands a jury trial on all issues so triable.

Dated: 4/26/2013

By: _____

Erica Morin
Virginia Bar No. 80707
*Attorney for Christy A. Butigan*
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: 202-663-6416
Fax: 202-663-6363
Email: Erica.Morin@wilmerhale.com

_____

Eric Mahr
Pro Hac Vice Admission Pending
*Attorney for Christy A. Butigan*
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: 202-663-6446
Fax: 202-663-6363
Email: Eric.Mahr@wilmerhale.com

_____

Andrew King
Pro Hac Vice Admission Pending
*Attorney for Christy A. Butigan*
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: 202-663-6748
Fax: 202-663-6363
Email: Andrew.King@wilmerhale.com

_____

Stacy Frazier
Pro Hac Vice Admission Pending
*Attorney for Christy A. Butigan*
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel: 202-663-6076
Fax: 202-663-6363
Email: Stacy.Frazier@wilmerhale.com